Mary T. Thielke,                              Civ. No. 11-3538 (SRN/LIB)

      Plaintiff,

v.                                                    **REPORT AND RECOMMENDATION**

MICHAEL J. ASTRUE,

      Commissioner of Social Security,

        Defendant.

 

      Mary T. Thielke (Plaintiff) seeks judicial review of the decision of the Commissioner of Social Security (Defendant) denying her application for disability insurance benefits (DIB). The matter was referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. This Court has jurisdiction over the claims pursuant to 42 U.S.C. § 405(g). The parties submitted motions for summary judgment. [Doc. Nos. 6, 9]. For the reasons set forth below, the Court recommends that Plaintiff's motion for summary judgment be granted for remand, and Defendant's motion for summary judgment be denied.

## I. BACKGROUND

### A. Procedural History

Plaintiff filed an application for DIB on December 2, 2005, alleging that she became disabled on January 1, 2005. (Tr. 13).[1] Her applications were denied initially on April 26, 2006, and upon reconsideration on May 24, 2006. (Tr. 133-37, 139-41). Plaintiff requested a hearing before an administrative law judge ("ALJ"), and a hearing was held before ALJ David Gatto on October 30, 2007. (Tr. 31-66). The ALJ denied Plaintiff's claim on January 22, 2008. (Tr. 112-27). Plaintiff then filed a request for review with the Appeals Council, and the Appeals Council vacated the decision on June 6, 2008, and remanded for further proceedings. (Tr. 129-32).[2] A second administrative hearing was held on June 24, 2010, this time before ALJ Larry Meuwissen. (Tr. 67-97). On August 24, 2010, the ALJ issued a partially favorable decision, awarding disability benefits beginning December 21, 2009. (Tr. 9-28). Plaintiff requested review by the Appeals Council, alleging an earlier onset date, and the request was denied on October 24, 2011 (Tr. 1-7), thereby making the ALJ's decision the final decision of the Commissioner for the purpose of judicial review. See Grissom v. Barnhart, 416 F.3d 834, 836 (8th Cir. 2005).

### B. Medical Records

---

[1] Throughout this Report and Recommendation, the Court refers to the administrative record, Docket No. 5, as "Tr."

[2] The remand instructions specifically directed the ALJ to consider whether Plaintiff's obesity constituted a severe impairment, and if so, how it affected Plaintiff's ability to perform physical activity. (Tr. 130). The ALJ was also ordered to consider Plaintiff's chronic fatigue syndrome under the guidelines of Social Security Ruling 99-2p. (Tr. 131).

In 2004, Plaintiff was evaluated and treated at Northwind Lung Specialists for poor sleep, fatigue and daytime hypersomnolence. (Tr. 385-89). She had earlier been diagnosed with moderate obstructive sleep apnea. (Tr. 459-60). Using a CPAP machine improved Plaintiff's sleep, but sometimes she had difficulty keeping the mask on all night. (Tr. 385). With limited success, Plaintiff tried both Ritalin and Provigil to decrease her daytime sleepiness. (Tr. 385-86, 388). On April 13, 2004, Dr. Lloyd Banaszak at Allina Medical Clinic diagnosed Plaintiff with hypersomnia, sleep apnea and chronic fatigue. (Tr. 397). He completed paperwork for Plaintiff to "stay out of work long-term." (Id.)

In June 2005, Dr. Banaszek noted Plaintiff was diagnosed with chronic fatigue syndrome several years earlier. (Tr. 392). She had been working as an accountant but quit two months ago due to fatigue. (Id.) She worked a few hours doing data entry at home. (Id.) Her symptoms included pain, fatigue, poor concentration, and poor sleep patterns. (Id.) Plaintiff was not having side effects from Paxil, and it was helping her anxiety and pain. (Id.) Plaintiff declined Dr. Banaszek's referral to a chronic fatigue clinic. (Id.)

On February 2, 2006, a state agency consulting physician, Dr. Aaron Mark, reviewed Plaintiff's social security disability file and completed a Physical Residual Functional Capacity Assessment form. (Tr. 405-12). He opined that Plaintiff had the ability to perform sedentary work. (Tr. 406-09). Dr. Mark's opinion was affirmed by Dr. Alan Suddard on May 23, 2006. (Tr. 440-42).

At the request of the Social Security Administration ("SSA"), Plaintiff underwent a consultative psychological examination on February 21, 2006, with Dr. Cynthia

Johnson. (Tr. 413-18). Plaintiff developed social anxiety in 1986, which was reasonably controlled with medications, specifically with Paxil for the last six years. (Tr. 413). Plaintiff no longer had panic attacks and only a small amount of anxiety each day. (Tr. 414). She had not been in therapy since 2000. (Id.) In November 2002, Plaintiff was diagnosed with chronic fatigue syndrome after having mononucleosis. (Tr. 413). Plaintiff's symptoms were pain, difficulty concentrating, and fatigue with little exertion. (Id.)

Dr. Johnson reviewed Plaintiff's work history. Plaintiff held her longest job, Accounting Manager at NSP, for thirteen years. (Tr. 414). After becoming a CPA, Plaintiff worked at two companies as a comptroller for a total of five years. (Id.) She never had difficulty completing her work before November 2003, when she was fired by Allina after one month of employment. (Id.) In 2003 and 2004, Plaintiff did consulting accounting work but could not keep up with it. (Id.) She presently was doing data entry work at home for a maximum of three hours per day. (Id.)

Plaintiff reported that she cut back on many activities since November 2003, including dancing, attending concerts, choir and volunteer church activities. (Tr. 415). She lived alone except when her two children were home from college. (Id.) Plaintiff described her daily activities. She woke up at 9:00 a.m., showered, dressed and rested. (Tr. 414-15). She went out to pick up her data entry work and returned home by 10:30 to eat breakfast. (Tr. 415). At 1:00 p.m., she worked at data entry for an hour and napped as long as three hours. (Id.) Then, she ate dinner, watched television, read or did more data entry. (Id.) She went to bed at 11:30 p.m. and used a CPAP machine for sleep. (Id.) Her sleep varied depending on stress. (Id.) Plaintiff also engaged in

church activities as her energy allowed.  (Id.)  She talked to her best friend daily and saw a group of friends once a week.  (Tr. 415-16).  She paced herself to do housework over the course of a week and hired someone to do yard work.  (Tr. 415).

Plaintiff appeared mildly anxious or depressed and had mild difficulty with concentration, probably due to fatigue.  (Tr. 416-17).  Dr. Johnson diagnosed social phobia, panic disorder without agoraphobia, and assessed a GAF score of 55.[3]  (Tr. 418).  She opined that Plaintiff could understand instructions, carry out mental tasks with mild difficulties with persistence and pace, respond appropriately to coworkers and supervisors but was unable to handle stressors of the workplace.  (Id.)

On April 14, 2006, a state agency psychological consultant, L. Kravitz, reviewed Plaintiff's social security disability file and completed Psychiatric Review Technique and Mental Residual Functional Capacity Assessment forms.  (Tr. 419-35).  Kravitz opined Plaintiff's mental impairments caused mild restrictions in activities of daily living, mild difficulties in social functioning, and moderate difficulty maintaining concentration, persistence or pace.  (Tr. 429).  Kravitz believed Plaintiff was capable of simple, routine work tasks.  (Tr. 435).

Plaintiff saw Dr. Banaszek on September 12, 2006, and reported Paxil helped her anxiety and panic attacks with no side effects but it did not significantly help her fatigue.  (Tr. 450-51).  Dr. Banaszek referred Plaintiff to Dr. Kenneth Britton for chronic fatigue evaluation at a physical medicine rehabilitation clinic.  (Tr. 453).  Plaintiff told Dr.

---

[3]     The Global Assessment of Functioning Scale is used by clinicians to subjectively rate the social, occupational and psychological functioning of adults.  *Diagnostic and Statistical Manual of Mental Disorders* 32 (American Psychiatric Association 4th ed. text revision 2000) ("*DSM-IV-tr*").  GAF scores of 51-60 indicated moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational or school functioning.  Id. at 34.

Britton that Ritalin had only decreased her fatigue for a two week period, and her insurance did not cover Provigil.  (Id.)  On examination, Dr. Britton noted Plaintiff was alert and oriented; her mood, affect and cognition were normal; she was obese; and she had normal range of motion, strength, balance, tone and coordination.  (Id.)  Dr. Britton recommended that Plaintiff try Effexor and Ambien and continue to use her CPAP.  (Tr. 453-54).  Although Plaintiff was psychologically intact, she could benefit from seeing a psychologist.  (Tr. 454).

On July 10, 2007, Plaintiff was looking for a new approach to treat her chronic fatigue, and she was evaluated by Dr. Carolyn Torkelson at University of Minnesota Medical Center-Fairview.  (Tr. 457).  In a review of systems, Dr. Torkelson noted Plaintiff was positive for increased weight, fatigue, weakness, visual changes, diarrhea, nausea, joint pain, stiffness, memory loss, poor concentration, nervousness and panic attacks.  (Id.)  She recommended that Plaintiff switch from Effexor to Paxil, take vitamins, and try an elimination diet.  (Tr. 458).  Two months later, Plaintiff said she felt worse on the diet, but she lost eight pounds and her irritable bowel syndrome improved.  (Tr. 455).  Her fatigue had not improved.  (Id.)  Plaintiff's panic attacks were well-controlled on Paxil, but she still had some low moods.  (Tr. 456).  Plaintiff would be going on a cruise the next month, and Dr. Torkelson recommended only that Plaintiff take Dramamine.  (Tr. 455-56).

On October 11, 2007, Dr. Torkelson completed several disability forms on Plaintiff's behalf, a Medical Assessment of Ability to do Work-Related Activities (Mental) and a Chronic Fatigue Syndrome RFC Questionnaire.  (Tr. 467-75).  In the former, Dr. Torkelson opined that Plaintiff had poor or no ability to deal with work stress and

maintain attention and concentration, a fair ability to understand, remember and carry out complex job instructions; and she had good abilities in all other categories of mental work tasks.  (Tr. 467-68).  However, Plaintiff would likely be absent from work more than three days per month due to her impairments.  (Tr. 469).  In the latter form,  Dr. Torkelson concluded:  1) fatigue would interfere with Plaintiff's concentration and attention frequently; 2) Plaintiff was incapable of even a low stress job; 3) stress triggered profound fatigue; 4) her symptoms started in November 2002; 5) walking six blocks might trigger fatigue; 6) she could sit for 45 minutes at a time, stand for ten minutes, and sit, stand and walk less than two hours each per day; 7) she would be required to sit or stand at will; 8) Plaintiff would need hourly breaks for one or two hours; 9) she could not stoop or crouch; 10) she could not engage in repetitive reaching, handling or fingering more than 10% of the day; 11) she could never lift and carry more than ten pounds; and 12) Plaintiff would be absent from work four days per month.  (Tr. 472-75).

In February through April 2008, Plaintiff was treated for vertigo and dizziness after a sudden onset.  (Tr. 477-479, 492-98, 507-08).  In March, she was diagnosed with possible peripheral vestibular pathology in the left ear.  (Tr. 507-08).  After vestibular rehabilitation and balance retraining, Plaintiff improved to the point where she could work at home seven or eight hours a week doing data entry.  (Tr. 492-93).

Plaintiff developed an anal fistula and underwent a fistulotomy in August 2008, with follow up surgery in January 2009.  (Tr. 537-40, 542-43, 548-49).  By the end of February 2009, Plaintiff felt completely healed from the second surgery.  (Tr. 535). During this period, Plaintiff began seeing a rheumatologist, Dr. Asim Said Khan.  (Tr.

576-78).  In October 2008, Dr. Khan noted Plaintiff's symptoms were consistent with fibromyalgia and myofascial pain syndrome; and she had a history of ulcerative colitis. (Tr. 577).  Dr. Khan treated Plaintiff with trigger point injections and prescribed Ultracet, Zanaflex and deep tissue massage.  (Tr. 578).  Plaintiff's pain and fatigue improved by December 2008, but she was having muscle spasms.  (Tr. 583).  Plaintiff had degenerative arthritis in her joints but no active synovitis.  (Id.)  Dr. Khan prescribed Lyrica and encouraged Plaintiff to continue with aqua therapy.  (Tr. 584).  Plaintiff's pain and fatigue continued to do better in March 2009, but she had break-through pain in her neck and mid-back muscles.  (Tr. 585.)  Dr. Khan gave Plaintiff trigger point injections and increased her Lyrica.  (Tr. 586).

On April 13, 2009, Plaintiff saw Dr. Alison Wagenknecht at Fairview-Fridley Clinic.  (Tr. 552.)  Plaintiff's only stressor at that time was the inability to work due to chronic fatigue.  (Id.)  Plaintiff was only able to sleep three hours at a time; and she took naps during the day.  (Id.)  Her mental status examination was normal.  (Id.)  Dr. Wagenknecht prescribed Ambien.  (Id.)  In June, Plaintiff was very stressed because she expected to lose her insurance.  (Tr. 588).  Zanaflex and Lyrica were helping, but she had a flare in neck and mid-back pain.  (Id.)  Dr. Khan treated her with trigger point injections.  (Id.)

At the end of the year, December 15, 2009, Plaintiff underwent a physical consultative examination with Dr. Azam Ansari at the request of the SSA.  (Tr. 625-28). Plaintiff was 5'8 and weighed 298 pounds, with a body mass index of 46.[4]  (Tr. 626).

---

[4]     Body mass index, calculated by one's height and weight, of 30 or higher indicates obesity.
http://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/index.html

Dr. Ansari provisionally diagnosed obesity, obstructive sleep apnea, chronic fatigue syndrome, fibromyalgia, inflammatory bowel, vitamin D deficiency, adjustment disorder with depressed mood, and generalized anxiety. (Tr. 627). Dr. Ansari also completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical) form. (Tr. 629-35). He opined Plaintiff could occasionally lift up to ten pounds; sit, stand and walk one hour each at a time, for a total of two hours each in an eight-hour day; occasionally reach, handle, finger, push, pull, and use foot controls; never be exposed to unprotected heights, dust, odors, fumes, pulmonary irritants, extreme temperatures and vibrations, loud or very loud noise; and never climb stairs, ladders, ramps, scaffolds, crouch or crawl. (Tr. 629-33).

The next week, December 21, 2009, Plaintiff underwent a consultative psychological evaluation with Dr. Donald Wiger. (Tr. 618-22). Plaintiff said her panic attacks were under control; and she was applying for disability primarily for physical complaints. (Tr. 618). Plaintiff worked at home doing bookkeeping, two days per week, four hours per day. (Id.) She otherwise spent her day watching television, reading, doing some chores and napping. (Tr. 619). She lived with her significant other and her son. (Id.) She went to church and also enjoyed knitting and crafts. (Id.) She was depressed 25% of the time. (Tr. 620). On examination, her mental status was normal. (Tr. 620-21). Dr. Wiger diagnosed anxious and depressive features with a GAF score in the mid-50s. (Tr. 621). He opined Plaintiff could mentally perform work tasks and handle stress in the workplace, but she may be affected by physical factors. (Id.)[5]

---

[5] This record coincides with the date ALJ, Larry Meuwissen, found Plaintiff's disability began. (Tr. 9-28).

**B.     Administrative Hearing**

On June 24, 2010, Plaintiff testified as follows at a hearing before Administrative Law Judge Larry Meuwissen.  (Tr. 67-97).  Plaintiff was 5'9" tall and weighed between 280-290 pounds.  (Tr. 71).  She had two children, now adults; and she lived with her significant other.  (Tr. 72).  She drove a car two to four times per week.  (Tr. 73).  Her hobbies were reading, knitting, craftwork and listening to music.  (Id.)  She sometimes went out for dinner or met a friend for coffee.  (Id.)  Plaintiff used a computer daily for email and bookkeeping.  (Id.)  She worked at an office doing bookkeeping two afternoons per week, four hours at a time.  (Tr. 74).  Plaintiff did not believe she could do this work full-time because after she worked a four-hour shift, she could not do anything at all the next day.  (Tr. 75).  Fatigue overwhelmed her.  (Id.)  Some days, she could not complete the four-hour work shift, but her employer was very flexible in letting her leave early and finish something later.  (Id.)  Plaintiff took Tramadol, Paxil, Anapril, Warfarin and Ambien for her various conditions.  (Tr. 76).  She saw a rheumatologist, Dr. Khan, every three months for fibromyalgia.  (Tr. 77).  Plaintiff was doing warm water pool therapy, but only once a week because it fatigued her.  (Tr. 79).

Plaintiff felt she could not work full-time due to fatigue with achiness and a feeling of weakness.  (Tr. 80).  On a good day, she could shower and dress without resting but on a bad day, she would have to stop and rest.  (Tr. 81).  Resting meant sitting in a chair, reading a newspaper or lying down.  (Tr. 82).  She rested for fifteen to thirty minutes between tasks, frequently lying down.  (Id.)  Her fatigue was always present.  (Id.)  Plaintiff spent ten to fifteen minutes a day checking emails or making phone calls.

(Tr. 83). If she felt okay, she made dinner at night and someone else cleaned up. (Id.) She worked only ten or fifteen minutes at a time before resting for fifteen to thirty minutes. (Tr. 84). If she pushed herself harder than that, she could not do anything. (Id.)

On bad days, Plaintiff might be too tired to shower and dress and went from sitting in a chair watching television to resting in bed. (Tr. 84). She had several bad days a week, especially when she worked the prior day. (Tr. 85). When she first stopped working full-time, Plaintiff tried to work longer part-time hours, but she was too fatigued. (Tr. 87). When fatigued, she was inactive and had difficulty concentrating for more than ten minutes. (Tr. 88). Increased stress and activity overwhelmed her. (Id.) Anything outside her normal routine was stressful. (Tr. 89). Pain from fibromyalgia also increased Plaintiff's fatigue. (Tr. 90). When she could not control the pain, she had to lie down. (Id.) Plaintiff had anxiety for twenty years, treated with Paxil. (Id.) Any stress caused her anxiety level to go up. (Tr. 91). She greatly reduced her former activities. (Tr. 91-92).

Norman Mastbaum testified as a vocational expert. (Tr. 92-95). The ALJ posed a hypothetical vocational question concerning a 50-year-old person with a college education and CPA certificate, who had the ability to perform sedentary work subject to no climbing of ropes, ladders or scaffolds and to avoid hazardous machinery and unprotected heights. (Tr. 93). Mastbaum testified such a person could perform Plaintiff's past relevant work. (Id.)

Plaintiff's counsel then posed several hypothetical questions. (Tr. 94). The first question assumed the hypothetical person would have poor or no useful ability to deal

with work stress or maintain attention and concentration.  (Id.)  Mastbaum testified there would be no work for such a person.  (Id.)  The next question assumed the hypothetical person was incapable of a low stress job because stress induced profound fatigue; and the individual otherwise could sit for 45 minutes, stand for ten minutes, but only sit or stand less than two hours each in an eight-hour day; the person would need hourly breaks for one or two hours, would only be able to use their hands 10% of the time, could lift ten pounds occasionally, and would have four bad days per month.  (Id.)  Mastbaum testified there would be no work for such a person.  (Tr. 95).

The next hypothetical question assumed the person could understand directions and carry out tasks, would have mild difficulty in persistence or pace, could respond appropriately to coworkers and supervisors, but would be unable to tolerate the stress of the workplace.  (Id.)  Mastbaum testified such a person was not competitively employable.  (Id.)  The final hypothetical question assumed the person was limited to sitting, standing and walking for two hours each in an eight-hour day.  (Id.)  Mastbaum testified such a restriction was contrary to full-time employment.  (Id.)

### C.  Function Reports

Plaintiff completed the SSA form "Function Report – Adult" on December 16, 2005, about a year after her alleged disability onset date.  (Tr. 265-72).  Plaintiff described her typical day as follows:

> I wake at approx. 9AM.  Shower.  Drive 5 miles to pick up data entry work & run any other required errand (usually one time per week).  Return home.  Depending on energy level- activity varies greatly.  Usually perform one housekeeping task in morning.  Read paper. Lunch.  TV.  Nap anywhere from ½ to 3 hrs.  Late afternoon do data entry for 1 ½ hours.  TV.  Read, telephone.  Rest.  Addtl data entry on computer for 1 ½ hours.  Quiet reading TV then bedtime.

(Tr. 265). Plaintiff also reported that she could no longer do the following things she used to do: work full-time, housekeeping and gardening, spend time out with friends and family, volunteer at church and school, and walk for exercise. (Tr. 266). She could still perform personal care, do light housekeeping with rest breaks, drive and grocery shop. (Tr. 266-68). She still engaged in hobbies of watching television, reading, cross-stitching, and doing puzzles, but time spent on her hobbies varied greatly depending on her energy. (Tr. 269). She continued to talk on the phone daily, email weekly, go out to dinner weekly and to church on a regular basis, and occasionally go to auctions and restaurants. (Id.)

Peter Grant, a friend of Plaintiff's, completed the SSA form "Function Report – Adult (Third-Party) on December 17, 2005. (Tr. 273-80). He corroborated Plaintiff's description of her daily activities and abilities to care for herself and her home. (Id.) Grant noted that Plaintiff watched more television and did less needlepoint and reading since her illness began. (Tr. 277). She could only pay attention for one or two hours. (Tr. 278). She went out with her friends less than she did before getting sick. (Id.) She could only walk 200 yards. (Id.) Her energy level was a tenth of what it used to be, and she gave up many activities and struggled to do things like attend her children's choir concerts. (Tr. 280).

### D. The ALJ's Decision

In concluding that Plaintiff was not disabled before December 21, 2009, the ALJ purported to follow the sequential, five-step process set forth in the Code of Federal Regulations. See 20 C.F.R. § 404.1520. Under the five-step sequential process, a claimant is disabled only if: 1) he or she is not presently engaged in substantial gainful

activity; 2) he or she has a severe impairment that significantly limits his or her ability to perform basic work activities; 3) his or her impairment is presumptively disabling; 4) if his or her impairment is not presumptively disabling, the claimant cannot perform his or her past relevant work; and 5) if the claimant cannot perform his or her past relevant work, the burden shifts to the Commissioner to prove that there are other jobs that exist in significant numbers that the claimant can perform. Simmons v. Massanari, 264 F.3d 751, 754-55 (8th Cir. 2001).

At the first step of the evaluation, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date. (Tr. 15). At the second step, the ALJ found that Plaintiff had severe impairments of morbid obesity, obstructive sleep apnea, and chronic fatigue syndrome, and as of December 21, 2009, Plaintiff also had severe impairments of anxiety and depression. (Tr. 16). In finding that Plaintiff did not have a severe mental impairment before December 21, 2009, the ALJ rejected several physicians' opinions. Based on Plaintiff's second psychological consultative examination on December 21, 2009, the ALJ concluded Plaintiff's mental impairments became severe on that date. (Id.) The ALJ noted Plaintiff reduced her activities, reported she had trouble concentrating, and that any amount of stress overwhelmed her and anything out of the ordinary caused her stress. (Id.)

At step three of the disability evaluation, the ALJ determined Plaintiff did not meet or equal a listed impairment. (Tr. 17-18). After reviewing the record, the ALJ found that prior to December 21, 2009, Plaintiff had the residual functional capacity (RFC) to perform sedentary work but never climb ropes, ladders or scaffolds or work around hazardous machinery or unprotected heights. (Tr. 18).

At the fourth step of the disability evaluation, the ALJ relied on the VE's testimony and concluded Plaintiff could perform her past relevant work as an accountant and data entry clerk, prior to December 21, 2009. (Tr. 21). However, because Plaintiff was only capable of unskilled work as of December 21, 2009, the ALJ found Plaintiff could no longer perform her past relevant work. (Id.) Plaintiff was closely approaching advanced age on December 21, 2009, and the ALJ found she had the RFC for less than a full range of sedentary work. (Tr. 22). Given Plaintiff's education and work experience, the ALJ determined, as of December 21, 2009, a finding of disabled was directed under Medical Vocational Rule 201.14.[6] (Tr. 22).

## II.    STANDARD OF REVIEW

Disability, as defined by the Social Security Act, is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To be eligible for benefits, an individual's impairments must be of "such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

---

[6]    Medical Vocational Rule 201.14 directs that a person is disabled if she is limited to sedentary work and is closely approaching advanced age, is a high school graduate or more, her work experience is skilled or semiskilled, and the skills are not transferable. 20 C.F.R. Part 404, Subpart P, Appendix 2, Rule 201.14. Individuals approaching advanced age are 50 to 54-years-old. Medical Vocational Rule 201.00(g). Plaintiff became 50-years-old on February 17, 2010. (Tr. 234). If a claimant is within a few days to a few months of reaching a higher age category, the ALJ will consider whether to use the older age category. Phillips v. Astrue, 671 F.3d 699, 702 (8th Cir. 2012) (quoting 20 C.F.R. § 404.1563)).

Judicial review of the Commissioner's decision to deny disability benefits is limited to a determination of whether the decision is supported by substantial evidence in the record as a whole. Tellez v. Barnhart, 403 F.3d 953, 956 (8th Cir. 2005). Substantial evidence means more than a scintilla but less than a preponderance. Slusser v. Astrue, 557 F.3d 923, 925 (8th Cir. 2009). Substantial evidence exists if "a reasonable mind would find such evidence adequate." Id. (quoting Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000). The substantial evidence test requires "more than a mere search of the record for evidence supporting the [Commissioner's] findings." Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007) (alterations in original) (quoting Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987)). Rather, the court "must take into account whatever in the record fairly detracts from its weight." Id. (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)).

## III. DISCUSSION

Plaintiff raises four issues in support of her motion for summary judgment. First, Plaintiff contends the ALJ erred in weighing the medical opinions and should have granted controlling weight to Dr. Torkelson's opinion or given her opinion greater weight based on the factors in 20 C.F.R. § 404.1527(d). Additionally, Plaintiff asserts the ALJ failed to analyze her chronic fatigue syndrome under SSR 99-2p and address the impact of her obesity on her ability to work, as required by the remand order.

Second, Plaintiff asserts the ALJ erred in finding her mental impairments nonsevere before December 21, 2009.

Third, Plaintiff contends the ALJ's analysis of her subjective complaints at step four of the evaluation was flawed because the ALJ cited only a few records without

conducting a meaningful review of the entire record.  Furthermore, the ALJ did not discuss the corroborating statements of Plaintiff's friend.

Fourth, Plaintiff argues the ALJ erred when he relied on the testimony of a vocational expert responding to a hypothetical question that omitted the restrictions placed on Plaintiff by her doctors.

The Court considers each of the foregoing issues in the order of the five-step disability process, beginning at step two.

### A.    Whether the ALJ Erred in Determining Plaintiff's Severe Impairments.

An impairment is severe if it significantly limits an individual's physical or mental ability to do basic work activities.  20 C.F.R. § 404.1520(c).  Severity is a de minimus standard,  Hudson v. Bowen, 870 F.2d 1392, 1395 (8th Cir. 1989), but an impairment is not severe if it would have no more than a minimal effect on the claimant's ability to work.  Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007).  Plaintiff had social anxiety for many years, and although treated with medication, she continued to have a small amount of anxiety each day.  (Tr. 414).  Dr. Johnson noted Plaintiff appeared mildly anxious or depressed and appeared to have mild difficulty with concentration on examination.  (Tr. 416-17).  If an individual's limitations in daily living, social functioning and concentration, persistence or pace are only mild, and the individual has not suffered any episodes of decompensation, the regulations support a finding that the mental impairment is not severe unless evidence otherwise indicates more than a minimal limitation in ability to do basic work activities.  Buckner v. Apfel, 646 F.3d 549, 557 (8th Cir. 2011) (quoting 20 C.F.R. § 404.1520a(d)(1)).  Dr. Johnson's evaluation, on its own, does not establish a severe impairment due to anxiety.

Apart from Dr. Johnson's minimal findings, Plaintiff's mental status examinations were normal. (Tr. 453, 552, 620-21). Plaintiff reported her panic attacks were under control with medication; and she did not complain of other symptoms of anxiety before December 21, 2009. (Tr. 414, 450-51, 618). In October 2007, Dr. Torkelson opined that Plaintiff had poor or no ability to deal with work stress or maintain attention and concentration, but her explanation was that stress increases fatigue and decreases Plaintiff's concentration, not that Plaintiff's depression or anxiety limited her ability to deal with stress or to concentrate. (Tr. 468, 472). In fact, Dr. Torkelson opined that "emotional factors" did not contribute to the severity of Plaintiff's symptoms and functional limitations, which suggests it was not anxiety that caused Plaintiff's lack of concentration or inability to handle work stress. (Tr. 471).[7]

Based on his review of the record on April 17, 2006, L. Kravitz, a state agency psychological consultant, opined that Plaintiff would have moderate difficulties in concentration, persistence or pace, attributable to her anxiety-related disorders. (Tr. 429-31). Kravitz's only explanation for his opinion was as follows:

> The CE's [consultative examiner's] conclusion that clmt would be not able to handle the stress of the workplace is not supported by the other evidence in the file presented by the CE, or other sources. The CE notes in the prior paragraph that "mental health symptoms do not appear to be significantly impacting her ability to seek or maintain employment." The evidence instead would indicate that "mentally," the clmt would be able to handle ordinary levels of work stress.

---

[7] At the hearing before the ALJ, Plaintiff attributed her inability to work full-time to chronic fatigue syndrome, and the ALJ found this to be a severe impairment. (Tr. 392, 618).

(Tr. 431). The forms Kravitz completed and the treatment records do not explain the basis for his opinion that anxiety caused Plaintiff moderate difficulties in concentration, persistence or pace. The ALJ did not err by rejecting Kravitz's opinion of a severe anxiety-related disorder. The evidence does not indicate Plaintiff's anxiety-related disorder caused more than a minimal limitation in her ability to do basic work activities before December 21, 2009.

**B.      Whether the ALJ Erred in his Residual Functional Capacity Determination.**

**1.      Whether the ALJ improperly weighed the medical opinions.**

In making an RFC determination, the ALJ must evaluate every medical opinion. 20 C.F.R. § 404.1527(c). The ALJ should give a treating source's RFC opinion controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 404.1527(c)(2); Heino v. Astrue, 578 F.3d 873, 879 (8th Cir. 2009). "Unless a treating source's opinion is given controlling weight, the administrative law judge must explain . . . the weight given to the opinions of a State agency medical or psychological consultant." 20 C.F.R. § 404.1527(e)(2)(ii); Willcockson, 540 F.3d 878, 880 (8th Cir. 2008). The factors used in weighing medical opinions are 1) length of treatment relationship; 2) nature and extent of treatment relationship; 3) supportability of the opinion; 4) consistency of the opinion with the record as a whole; 5) specialization of the physician; and 6) any other factor brought to the ALJ's attention. 20 C.F.R. § 404.1527(c).

Dr. Torkelson, who treated for chronic fatigue syndrome for three months, completed a Chronic Fatigue Syndrome Questionnaire form regarding the effects of

chronic fatigue syndrome on Plaintiff's ability to do certain physical and mental tasks. (Tr. 467-75). She also completed a Medical Assessment of Ability to do Work-Related Activities (Mental) form. (Tr. 467-75). The ALJ rejected Dr. Torkelson's opinion, stating it was based solely on Plaintiff's subjective complaints, was inconsistent with Plaintiff's daily activities, inconsistent with the record as a whole, and she treated Plaintiff infrequently. (Tr. 17, 20). The ALJ rejected the opinion of the consultative physical examiner, Dr. Ansari, whose opinion was very similar to Dr. Torkelson's opinion. (Tr. 20). The ALJ stated Dr. Ansari's opinion on Plaintiff's ability to sit, stand and walk was inconsistent with the weight of the record. (Id.) Instead, the ALJ granted great weight to the state agency consultants' opinions (Exhibits B3F and B10F [Tr.398-401, 440-42]) as consistent with the weight of the evidence and their familiarity with the regulations for disability determinations. (Id.)

Plaintiff asserts the following errors in the ALJ's evaluation: (1) the ALJ provided no analysis of how Dr. Torkelson's opinion was inconsistent with the record, and her opinion was consistent with the only other examining physician's opinion (Dr. Ansari); (2) the ALJ rejected Dr. Torkelson's opinion because she saw Plaintiff infrequently but accepted the state agency physicians' opinions although they never met Plaintiff; (3) the ALJ gave no explanation how Dr. Ansari's opinion was inconsistent with the record; (4) the state agency physicians' understanding of the regulations does not provide a better foundation to determine the limitations caused by Plaintiff's impairments; (5) the remand order required the ALJ to analyze Plaintiff's obesity and analyze chronic fatigue under Social Security Ruling ("SSR") 99-2p. (Tr. 20).

SSR 02-1p provides guidance on evaluating obesity in assessing residual functional capacity. SSR 02-1p (S.S.A. Sept. 12, 2002), 2002 WL 34686281 at *6. The following statements in the ruling are relevant here: 1) obesity may create limitations in physical functions such as sitting, standing, walking and lifting, postural functions such as climbing, balancing, stooping and crouching; 2) people with obesity and sleep apnea can be drowsy or lack mental clarity during the day; 3) obesity may affect a person's ability to sustain a function over time; for example, fatigue may affect an individual's physical and mental ability to sustain work activity; and 4) the combined effects of obesity with other impairments may be greater than might be expected without obesity. Id.

The ALJ addressed Plaintiff's obesity as follows:

> I have also considered limitations that may result from the claimant's obesity, in accordance with SSR 02-1p. I find that the residual functional capacity defined above accounts for any limitations that the claimant may have because of this impairment.

(Tr. 20). The Court cannot determine whether the ALJ's conclusion is supported by substantial evidence in the record because the ALJ did not explain his analysis. SSR 02-1p states obesity may cause limitations in sitting, standing, walking, but the ALJ rejected Dr. Ansari's opinion on these physical limitations. Plaintiff was well above the body mass index for obesity when she saw Dr. Ansari, and Dr. Ansari opined Plaintiff was limited to sitting, standing and walking one hour each at a time, for a total of two hours each in an eight-hour day. SSR 02-1p also provides that the combination of obesity and sleep apnea may cause daytime drowsiness or lack of mental clarity during the day. Plaintiff had sleep apnea and alleged daytime fatigue and lack of

concentration. Dr. Torkelson opined that Plaintiff's fatigue would frequently interfere with her attention and concentration, but the ALJ rejected her opinion without specifically addressing the interplay of obesity and sleep apnea. Additionally, SSR 02-1p states the combination of obesity with other impairments might have a greater effect on a person than obesity alone. Plaintiff was not only obese, she had sleep apnea, chronic fatigue and fibromyalgia, all of which individually might cause debilitating fatigue, the primary symptom that Plaintiff alleged prevented her from working in full-time competitive employment. Under the circumstances, it simply is not enough for the ALJ to say he considered SSR 02-1p and arrived at the RFC.

Unlike the ruling on obesity, which the ALJ acknowledged and said he considered, the ALJ did not even mention the rule on chronic fatigue syndrome. SSR 99-2p defines chronic fatigue syndrome as "a systemic disorder consisting of a complex of symptoms that may vary in incidence, duration and severity. SSR 99-2p (S.S.A.) 1999 WL 271569 at *1 (April 30, 1999). It is characterized in part by prolonged fatigue that lasts 6 months or more and results in substantial reduction in previous levels of occupational, educational, social, or personal activities." (Id.) The following symptoms are associated with a diagnosis of CFS: self-reported impairment in short-term memory or concentration severe enough to cause substantial reduction in activities; sore throat; tender lymph nodes; muscle pain; multi-joint pain without swelling or tenderness; headaches of a new type; unrefreshing sleep; and postexertional malaise lasting more than 24 hours. Id. at *2.

SSR 99-2p provides guidance in evaluating the claimant's functional restrictions. First, "[o]pinions from an individual's medical sources, especially treating sources,

concerning the effects of CFS on the individual's ability to function in a sustained manner in performing work activities or in performing activities of daily living are important in enabling adjudicators to draw conclusions about the severity of the impairment(s) and the individual's RFC." Id. at *7. In this regard, any information a medical source is able to provide contrasting the individual's impairment(s) and functional capacities since the alleged onset of CFS with the individual's status prior to the onset of CFS will be helpful in evaluating the individual's impairment(s) and its functional consequences." Id. Second, "[t]hird-party information . . . may be very useful in deciding the individual's credibility. . ." and "the adjudicator should carefully consider this information when making findings about the credibility of the individual's allegations. . ." Id. at 8.

In this case, the ALJ adopted the RFC opinions of consulting physicians who never met or examined Plaintiff over the opinions of a treating physician and a consulting examining physician, without acknowledging the additional importance placed on a treating physician's opinion under SSR 99-2p. The ALJ rejected Dr. Torkelson's opinion in part because it was "based solely" on Plaintiff's subjective reports. It is difficult to fathom, short of personally following a patient throughout the whole of her typical day, how a treating physician would be able to comment on the individual's ability to "function in a sustained manner in performing work activities or in performing activities of daily living," if the physician cannot rely on the individual's reports. In this case, Plaintiff worked full-time for many years before the November 2002 onset of chronic fatigue syndrome, and as of her January 1, 2005 alleged disability onset date, she worked no more than nine hours per week. (Tr. 239). Plaintiff also

reported greatly reducing her personal activities after the onset date. (Tr. 415, 91-92). Her significant other, Peter Grant, completed a third-party function report, corroborating Plaintiff's subjective complaints. (Tr. 280). Despite the suggestion in SSR 99-2p that an ALJ should carefully consider third-party reports when assessing the credibility of a claimant's subjective complaints, the ALJ simply acknowledged Grant's corroboration without any further discussion. (Tr. 16). The ALJ stated in general that objective medical evidence was inconsistent with Plaintiff's allegations, but there is no laboratory or diagnostic test to confirm chronic fatigue syndrome. SSR 99-2p, 1999 WL 271569 at *1-2. CFS is diagnosed based on the presence of a number of symptoms, including self-reported reduction in previous activities that cannot be explained by another physical or mental disorder. Id. The only specific evidence the ALJ cited as inconsistent with the treating and examining physicians' opinions was a list of Plaintiff's activities.

The Court finds the ALJ's analysis and weighing of the medical opinions to be deficient.

### 2. Whether the ALJ erred in his credibility analysis.

When analyzing a claimant's subjective complaints, the ALJ must consider the following credibility factors: 1) daily activities; 2) duration, frequency and intensity of pain; 3) precipitating and aggravating factors; 4) dosage, effectiveness and side effects of medication; and 5) functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). The ALJ may not discount a claimant's credibility solely because the objective evidence does not fully support his subjective complaints, but may discount credibility based on inconsistencies in the record as a whole. Ellis v. Barnhart, 392 F.3d

988, 996 (8th Cir. 2005).  Courts should defer to the ALJ's credibility findings when the ALJ gives good reasons that are supported by substantial evidence.  Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005) (citing Gregg v. Barnhart, 354 F.3d 710, 714 (8th Cir. 2003).  The ALJ is expected to "detail the reasons for discrediting the testimony and set forth the inconsistencies found."  Id. at 802 (quoting Lewis v. Barnhart, 353 F.3d 642, 647 (8th Cir. 2003)).

In rejecting Plaintiff's credibility, the ALJ stated:

> The claimant performed some work activity after the alleged onset date, as noted above.  Although this work activity was not sufficient to establish the presumption that she was participating in substantial gainful activity under the regulations, it does indicate that the claimant's abilities were sufficient to perform some work activity, contradictory to her allegations of inability to work throughout the applicable time period.

(Tr. 20).  This statement is essentially circuitous and out of context when assessing Plaintiff's subjective complaints.  Plaintiff did not allege she could not work part-time; she described her part-time work on many occasions.  Part-time work activity does not necessarily preclude disability.  See Cline v. Sullivan, 939 F.2d 560, 565-66 (8th Cir. 1991) ("An ALJ should not penalize a claimant who, prior to an award of benefits, attempts to make ends meet by working in a modest, part-time job"); Kelley v. Callahan, 133 F.3d 583, 588 (8th Cir. 1998) ("largely passive work responsibilities" were not inconsistent with testimony regarding pain).  The Plaintiff has always alleged she could not work full-time in any meaningful capacity.

The only other analysis of Plaintiff's activities by the ALJ is in the ALJ's separate discussion of whether Plaintiff's depression and anxiety were "severe" mental impairments. The ALJ stated, "[i]n a function reported dated in December 2005,

claimant described a very active lifestyle." (Tr. 16). The ALJ then described Plaintiff's daily routine as she provided in her function report, but leaving out her statement that she naps anywhere from half an hour to three hours in the afternoon. (Tr. 16, 265). This part of her day is obviously significant when her allegation is that she is impaired primarily by fatigue. Furthermore, the ALJ did not discuss the quality of Plaintiff's limited part-time work, hobbies and light housekeeping, and how this reflects on her ability to work day-in, day-out on a full-time competitive basis. See Leckenby v. Astrue, 487 F.3d 626, 634 (8th Cir. 2007) ("'consideration should be given to . . . the quality of daily activities . . . and the ability to sustain activities, interests, and relate to others *over a period of time*'") (quoting Reed v. Barnhart, 399 F.3d 917, 922 (8th Cir. 2005) (emphasis in original)); Brosnahan v. Barnhart, 336 F.3d 671, 677 (8th Cir. 2003) ("in the context of a fibromyalgia case, . . . activities such as cooking, cleaning, and hobbies, do not constitute substantial evidence of the ability to engage in substantial gainful activity.") In light of the nature of the combination of Plaintiff's impairments and the nature of chronic fatigue syndrome, the ALJ's credibility analysis was also deficient.

Therefore, on this basis, the Court recommends remand for further consideration of Plaintiff's residual functional capacity before December 21, 2009.

### C. Whether the Vocational Expert's Testimony is Substantial Evidence on the Record Supporting the ALJ's Determination that Plaintiff Could Perform Her Past Relevant Work Before December 21, 2009.

An ALJ can rely on a vocational expert's testimony if the testimony was based on a properly phrased hypothetical question. Cruze v. Chater, 85 F.3d 1320, 1323 (8th Cir. 1996). However, where the ALJ's RFC determination is deficient, a hypothetical question based on the RFC does not constitute substantial evidence in the record.

Lauer v. Apfel, 245 F.3d 700, 706 (8th Cir. 2001).   Therefore, additional vocational testimony may be required upon remand, after the ALJ further develops the issues as described above, and comes to an RFC determination for prior to December 21, 2009 based on all of the evidence in the record.

## VI.    CONCLUSION

Based on the foregoing and all of the files, records and proceedings herein, IT IS HEREBY RECOMMENDED that:

1.    Plaintiff's Motion for Summary Judgment [Docket No. 6] be GRANTED;

2.    Defendant's Motion for Summary Judgment [Docket No. 9] be DENIED;

3.    The case be remanded for further proceedings consistent with this Report and Recommendation, pursuant to Sentence Four of 42 U.S.C. § 405(g).

4.    If this Report and Recommendation is adopted, that Judgment be entered accordingly.


Dated:  January 24, 2013

s/Leo I. Brisbois
LEO I. BRISBOIS
United States Magistrate Judge


NOTICE

Pursuant to Local Rule 72.2, any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by February 7, 2013 a writing that specifically identifies the portions of the Report to which objections are made and the bases for each objection.   A party may respond to the objections within fourteen days of service thereof.   Written submissions by any party shall comply with the applicable word limitations provided for in the Local Rules.   Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.   This Report and Recommendation does not constitute

an order or judgment from the District Court, and it is therefore not directly appealable to the Court of Appeals.